[Civ. No. 23651. Third Dist. June 4, 1985.]

LOIS KOHLER, Plaintiff and Appellant, v.
ASPEN AIRWAYS, INC., Defendant and Respondent.

1194

COUNSEL

Cyril R. Ash for Plaintiff and Appellant.

Engstrom, Lipscomb & Lack, William L. Schanz and Deborah J. Olsen for Defendant and Respondent.

OPINION

CARR, J.—On a flight from San Jose to South Lake Tahoe, defendant's airplane encountered clear air turbulence, causing the plane to plummet 500 feet in two to three seconds. Plaintiff, a fare-paying passenger on the flight, sustained neck injuries. She filed suit against Aspen Airways alleging negligence generally of the defendant in causing the airplane to precipitously drop and further specific acts of negligence in (1) failing to fly or direct the aircraft on a flight plan that would minimize or avoid the effect on the aircraft and its passengers of the turbulence, which was known or should have been known to defendant, and (2) failing to warn plaintiff of such air turbulence and its possible effect on the aircraft. The jury returned a unanimous defense verdict.

On appeal, plaintiff contends (1) there was insufficient evidence to support the jury's verdict and (2) the court erred in refusing plaintiff's proposed instructions on (a) res ipsa loquitur and (b) an airline's duty to warn its passengers before takeoff of possible turbulence in the flight path. We shall affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Viewed in a light most favorable to the jury's verdict, the evidence discloses the following:

Shortly before 9 a.m. on January 26, 1980, plaintiff boarded Aspen Airway's flight No. 309 for the 45-minute trip from San Jose to South Lake Tahoe. The flight crew performed its usual preflight check and obtained

teletyped weather information for their route.[1] The weather forecast at flight time indicated clear weather with occasional moderate turbulence within 5,000 feet of ground level throughout the entire state. Turbulence is classified as slight, moderate, severe or extreme. The flight's pilot testified "moderate" turbulence causes the aircraft to "move around," although the plane is controllable. Passengers feel some restraint against their seats and walking is difficult. The pilot also stated "occasional" turbulence meant the turbulence occurs less than one-third of the time. According to pilots and meterologists, such an area forecast was very common, as the weather service in the area in question tries to predict the worst a pilot can encounter that day. However, such turbulence was not usually experienced when the forecast was this generalized. Because it was the first flight of the day to Tahoe, the pilot kept the seat belt sign on for the entire flight as a precautionary measure.

The pilot received permission to deviate from the programmed flight pattern[2] and came into the Tahoe area over Fallen Leaf Lake. The weather was clear and the flight had been smooth. While over the lake at 10,000 feet, the plane unexpectedly hit a pocket of severe clear air turbulence and in "a moment of sheer terror" fell 500 feet in a matter of seconds. When the plane hit the bottom of the air pocket, the passengers were jarred[3] and plaintiff, who was wearing her seat belt, injured her neck.[4] The plane landed safely at South Lake Tahoe Airport without further problems.

At trial, plaintiff's witnesses testified wind shears and turbulence in the Lake Tahoe area were common occurrences. Plaintiff further presented weather forecasts for a three-state region,[5] National Weather Service SIG-METS (defined as a "significant meteorological event") and pilot reports of occasional severe turbulence in the Tahoe area, made *after* flight No. 309 landed.[6] An expert witness, a pilot for a private corporation, testified that

---

[1]Surface winds at Lake Tahoe were very light. Winds aloft at 10,000 feet were charted at approximately 30 knots per hour.

[2]Contrary to plaintiff's assertion, this deviation was not made solely to save time and fuel. Pilots testified this approach into the South Lake Tahoe Airport was safer as it provided greater maneuverability in the event a landing needed to be aborted, as the plane would be headed over the lake rather than into the mountains.

[3]The turbulence knocked coats off hangers, spilled an ice chest and drinks, and caused a flight attendant to fall.

[4]Plaintiff underwent surgery in August 1980 for a cervical radiculopathy, a herniated disk with compression of the nerve root.

[5]The general forecast indicated occasional severe turbulence in Washington. A report of significant meteorological phenomenon (SIGMET) for a specific area of Washington was issued at 6:54 a.m., warning of "occasional moderate turbulence within 5,000 feet above ground level."

[6]The first SIGMET for California was issued at 10:15 a.m.

he did not consider the route taken by flight No. 309 to be a safe one. This witness based his analysis on plaintiff's contention that the plane approached Tahoe via Desolation Valley. The flight's pilot testified he did not fly over that area.

The testimony of defense witnesses conflicted with that of plaintiff's witness. This evidence was that the plane's route was completely safe.[7] Meteorologists and pilots testified no weather reports available at flight time indicated any severe turbulence around Lake Tahoe.[8] Moreover, given the subsequent SIGMETS and pilot reports, which showed turbulence in an extensive area around the lake, it was unlikely a better route into the airport existed.

The trial consumed five days. The jury deliberated for one hour before returning a verdict for defendant. Plaintiff's motion for a new trial was denied, and this appeal followed.

## I

Plaintiff initially contends the jury's verdict was not supported by substantial evidence.

"In reviewing the evidence on . . . appeal all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. [Citations.]" (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; see also *Leff* v. *Gunter* (1983) 33 Cal.3d 508, 518 [189 Cal.Rptr. 377, 658 P.2d 700]; *Chodos* v. *Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 97 [178 Cal.Rptr. 831]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, pp. 4236-4238, and cases therein.)

---

[7]The Federal Aviation Administration did not list any preferred routes into Lake Tahoe.

[8]Pilots testified they looked for the following inflight occurrences as warnings of turbulence or heavy winds: cloud buildup, blowing snow on the mountains, waves on the lake, minor turbulence, and/or wind drift of the plane. None of these occurred before the mishap.

■ Defendant presented overwhelming evidence the turbulence was unforeseeable and that the flight's crew exercised the requisite degree of care.[9] There was no indication of severe turbulence anywhere in the Tahoe area at the time the flight departed San Jose. The flight crew took an approved, safe route to the airport and handled all aspects of the flight properly throughout the trip.

Conflicting testimony was presented, and the jury believed defendant's witnesses. Substantial evidence exists to support that decision.

## II

Plaintiff's primary contention is the trial court erred in refusing two of plaintiff's proposed instructions, on res ipsa loquitur as applicable to this accident and on the duty of defendant to warn plaintiff of possible air turbulence.

### Res Ipsa Loquitur Instruction

The two instructions submitted by plaintiff on res ipsa loquitur were the conditional res ipsa loquitur instruction found in BAJI No. 4.00 and the followup instruction of BAJI No. 4.02. The proposed instructions are as follows: "On the issue of negligence, one of the questions for you to decide in this case is whether the injury involved occurred under the following conditions:

"First, that it is the kind of injury which ordinarily does not occur in the absence of someone's negligence;

"Second, that it was caused by an agency or instrumentality in the exclusive control of the defendant; and

"Third, that the injury was not due to any voluntary action or contribution on the part of the plaintiff which was the responsible cause of his injury.

"If, and only in the event that you should find all of these conditions to exist, you are instructed as follows:

---

[9]The court gave the following special instruction, proposed by plaintiff, concerning defendant's duty of care: "Common carriers owe a duty of utmost care and the vigilance of a very cautious person toward their passengers. They are responsible for any, even the slightest negligence, and are required to do all that human care, vigilance and foresight reasonably can do under the circumstances."

"From the happening of the injury involved in this case, you may draw an inference that a legal cause of the occurrence was some negligent conduct on the part of the defendant.

"However, you shall not find that a legal cause of the occurrence was some negligent conduct on the part of the defendant unless you believe, after weighing all the evidence in the case and drawing such inferences therefrom as you believe are warranted, that it is more probable than not that the occurrence was caused by some negligent conduct on the part of the defendant."

■ It is settled law in this state that "[t]he doctrine of res ipsa loquitur is applicable where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the one responsible." (*Di Mare* v. *Cresci* (1962) 58 Cal.2d 292, 298-299 [23 Cal.Rptr. 772, 373 P.2d 860].) Three conditions are required for the application of the doctrine: " '(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.' [Citation.]" (*Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258].) Although this determination is usually made by the jury, the applicability of res ipsa loquitur may be established as a matter of law where no question of fact exists. (*Fuller* v. *Sears, Roebuck & Co.* (1982) 136 Cal.App.3d Supp. 1, 7 [186 Cal.Rptr. 26]; *Hansen* v. *Matich Corp.* (1965) 234 Cal.App.2d 129, 135 [44 Cal.Rptr. 149].)

We observe the term res ipsa loquitur originated in a case involving a falling object. A critical distinction between our case and *Bryne* v. *Boadle* (1863) 2 H. & C. 722, 725, 159 Eng.Rep. 299, 300, however, was the location of the victim in relation to the falling object. Here the victim was inside it; in *Bryne* v. *Boadle, supra,* he was under it.[10]

California courts have found appropriate application of the doctrine, either as a factual issue or a matter of law, in a variety of factual situations. Accidents on common carriers such as trains, streetcars and buses provide

[10]As related by William L. Prosser, *Res Ipsa Loquitur in California* (1949) 37 Cal.L.Rev. 183, "In the year 1863 a barrel of flour rolled out of the window of an English warehouse and into the lives of all tort lawyers. It fell upon a passing pedestrian, who sued the owner of the warehouse for his injuries. At the trial a question arose as to the necessity of some affirmative proof of the defendant's negligence; and in the course of a brief colloquy with counsel, Baron Pollock made use of a familiar and homely phrase. He said, 'The thing speaks for itself.' Unfortunately, since he was a classical scholar in the best tradition of English judges, he said it in Latin."

many examples. (*Hardin* v. *San Jose City Lines, Inc.* (1953) 41 Cal.2d 432, 436 [260 P.2d 63] and *Freitas* v. *Peerless Stages* (1952) 108 Cal.App.2d 749, 753 [239 P.2d 671, 33 A.L.R.2d 778] (sudden stop by bus); *Adam* v. *Los Angeles Transit Line* (1957) 154 Cal.App.2d 535, 539 [317 P.2d 642] (streetcar seat in front of plaintiff broke and fell on her); *Williamson* v. *Pacific Greyhound Lines* (1947) 78 Cal.App.2d 482 [177 P.2d 977] (bus swayed and jolted while negotiating sharp curve in highway causing luggage to fall from racks onto passengers).

Other situations have included falling objects other than barrels of flour (*Mintzer* v. *Wilson* (1937) 21 Cal.App.2d 85, 88 [68 P.2d 370] (plaster fell from ceiling on plaintiff); *Raber* v. *Tumin* (1951) 36 Cal.2d 654, 657 [226 P.2d 574] (falling ladder struck plaintiff invitee in defendant's store)); defective appliances and equipment (*Stanford* v. *Richmond Chase Co.* (1954) 43 Cal.2d 287, 292 [272 P.2d 764] (fork lift used to lift boxes on truck); *Owens* v. *White Memorial Hospital* (1956) 138 Cal.App.2d 634, 638 [292 P.2d 288]; (hospital bed with broken safety spring fell on plaintiff); *Rose* v. *Melody Lane* (1952) 39 Cal.2d 481, 486 [247 P.2d 335] (bar stool with defective pin in base broke causing plaintiff to fall); *Dennis* v. *Carolina Pines Bowling Center* (1967) 248 Cal.App.2d 369, 376 [56 Cal.Rptr. 453]; (glass door with loose aluminum frame broke); *Pappas* v. *Carson* (1975) 50 Cal.App.3d 261 [123 Cal.Rptr. 343] (fire started from overloading of electrical circuits or defective installation of wire)).

Explosions in appropriate cases and bursting bottles have been held to be proper res ipsa loquitur cases. For explosion examples see *Hinds* v. *Wheadon* (1942) 19 Cal.2d 458, 461 [121 P.2d 724] (explosion of dehydrator tank); *Baker* v. *B. F. Goodrich Co.* (1953) 115 Cal.App.2d 221, 223 [252 P.2d 24] (automobile tire burst during inflation) and *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 458 [150 P.2d 436] (Coca Cola); *Zentz* v. *Coca Cola Bottling Co.* (1952) 39 Cal.2d 436, 440 [247 P.2d 344] (Coca Cola); and *Gordon* v. *Aztec Brewing Co.* (1949) 33 Cal.2d 514, 523 [203 P.2d 522] (beer), for bursting bottle cases.

The application of res ipsa loquitur to aircraft accidents has, however, as observed by Justice Sullivan in *Newing* v. *Cheatham* (1975) 15 Cal.3d 351, 360 [124 Cal.Rptr. 193, 540 P.2d 33], "vexed the courts of many jurisdictions for decades." The reason for this, as opined by Prosser, was that "[t]he earlier cases dealing with aviation took the position that there was not yet such common knowledge and experience of its hazards as to permit such a conclusion from the unexplained crash of a plane." (Prosser on Torts (5th ed. 1984) § 39, p. 246.) However, with the technological advances in the safety of air travel and the increasing frequency of air travel, the trend has been reversed. Res ipsa loquitur has now been applied to a variety of

airplane accidents. (See e.g. *Smith* v. *O'Donell* (1932) 215 Cal. 714 [12 P.2d 933] (collision between two airplanes); *Mittelman* v. *Seifert* (1971) 17 Cal.App.3d 51 [94 Cal.Rptr. 654] (crash of single plane); *Roberts* v. *Trans World Airlines* (1964) 225 Cal.App.2d 344 [37 Cal.Rptr. 291] (aircraft landing accident but defendant rebutted inference of negligence); *Nelson* v. *American Airlines, Inc.* (1968) 263 Cal.App.2d 742 [70 Cal.Rptr. 33]; (malfunction of automatic pilot and sudden, unexpected maneuver of aircraft); *Cox* v. *Northwest Airlines, Inc.* (7th Cir. 1967) 379 F.2d 893 (disappearance of airplane).) See also Annot., Res Ipsa Loquitur In Aviation Accidents (1983) 25 A.L.R.4th 1237.)

In *Newing* v. *Cheatham, supra,* 15 Cal.3d 351 (crash of a private airplane) and *Irwin* v. *Pacific Southwest Airlines* (1982) 133 Cal.App.3d 709 [184 Cal.Rptr. 228] (collision between commercial airline plane and small private plane) res ipsa loquitur was applied as a matter of law, by directed verdict in *Newing* v. *Cheatham, supra,* and summary judgment in *Irwin* v. *Pacific Southwest Airlines, supra.*

■ In the instant case, we have a turbulence mishap and generally res ipsa loquitur has not been applied where natural conditions affect the airplane's operation. (See, e.g., *Newing* v. *Cheatham, supra,* 15 Cal.3d at p. 361, fn. 4.) Prosser specifically mentions "the lurch or bump of a plane when unexpected air currents are suddenly encountered" is an event not warranting application of res ipsa loquitur. (Prosser, *supra,* at p. 247.)

In *Cudney* v. *Midcontinent Airlines* (1953) 363 Mo. 922 [254 S.W.2d 662], a passenger was thrown from her seat when the plane in which she was riding made an unexpected and severe drop in altitude. In holding a res ipsa loquitur instruction improper, the court stated, "In short, it is not possible at this date, as it may be in another day, to say that it is the common experience of mankind that commercial airliners do not lurch and drop for some distance except for negligence in the operation of the plane . . . ." (P. 667.) In *Kelly* v. *American Airlines, Inc.* (5th Cir. 1975) 508 F.2d 1379, the court noted "[t]he overwhelming weight of authority has declined to invoke res ipsa loquitur in air turbulence cases," because the first requirement of the doctrine, i.e., that the event not usually occur in the absence of negligence, cannot be met (p. 1380). "[S]udden changes in meteorological conditions which cause the atmosphere to be disturbed, to become choppy and rough and its motion irregular, whether referred to as turbulence or by any other nomenclature, cannot be anticipated or avoided. The lurching, dipping or bumping of an aircraft when such unexpected air currents are suddenly encountered certainly do not spell out negligence on the part of the plane's operator." (*Sanchez* v. *American Airlines* (1981) 106 Misc.2d 1010, 1013-1014 [436 N.Y.S.2d 824].) For the same reason, other courts

considering this issue have also refused to allow liability predicated on res ipsa loquitur. (*Gafford* v. *Trans-Texas Airways* (6th Cir. 1962) 299 F.2d 60; *Lazarus* v. *Eastern Air Lines, Inc.* (D.C.Cir. 1961) 292 F.2d 748; *Ness* v. *West Coast Airlines, Inc.* (1965) 90 Idaho 111 [410 P.2d 965].)

We are persuaded by the reasoning in those cases: an injury arising from an encounter with air turbulence cannot be said to ordinarily occur only because defendant was negligent. The trial court properly refused to give plaintiff's proposed instruction on res ipsa loquitur.

### Duty to Warn Instruction

■ Relying on *Fleming* v. *Delta Airlines* (S.D.N.Y. 1973) 359 F.Supp. 339, plaintiff contends she was entitled to her proposed instruction stating defendant had a duty to warn passengers before departure of anticipated turbulence on the flight.[11] In requiring such an instruction, the *Fleming* court held the pilot should have known moderate to severe turbulence might be encountered because weather reports indicated the flight path went through areas with tornadoes, hailstorms, thunderstorms, and gusts of wind from 50 to 70 miles per hour. (At p. 341.)

In contrast, no turbulence was forecast for the Tahoe area, other than that indicated in the general statewide weather report. We cannot require defendant to be clairvoyant and warn of unforeseeable severe turbulence. An airline has no duty to warn of dangers about which it has no knowledge. (*Marshall* v. *United Airlines* (1973) 35 Cal.App.3d 84, 90 [110 Cal.Rptr. 416].)

Moreover, in the context of medical malpractice arising out of a failure to warn, "There must be a causal relationship between the physician's failure to inform and the injury to the plaintiff. Such causal connection arises only if it is established that had revelation been made consent to treatment would not have been given." (*Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 245 [104 Cal.Rptr. 505, 502 P.2d 1]; *Stone* v. *Foster* (1980) 106 Cal.App.3d 334, 351-352 [164 Cal.Rptr. 901]; *Morgenroth* v. *Pacific Medical Center, Inc.* (1976) 54 Cal.App.3d 521, 534 [126 Cal.Rptr. 681].) Thus, a physician is liable for a failure to warn only "if a reasonably prudent person in the patient's position would not have consented to the [treatment] [opera-

---

[11]This instruction read, "It is the duty of an airline to share with its passengers before departure information indicating any turbulent weather conditions along the line of the proposed flight, which conditions they had knowledge or in the exercise of reasonable care should have had knowledge, so that the passengers could choose for themselves whether they were physically and emotionally capable of undertaking the trip. Failure to share such information on the part of the airline would constitute negligence."

tion] if he had been adequately informed of all the significant perils." (BAJI No. 6.11 (1980 rev.); see *Truman* v. *Thomas* (1980) 27 Cal.3d 285, 294 [165 Cal.Rptr. 308, 611 P.2d 902].) We see no reason why this requirement of causation should not be applied to the situation presented here. The record before us contains no evidence that a reasonably prudent person would have refused to take the flight in question had he or she been warned of possible air turbulence. In fact, the morning after the incident plaintiff returned to San Jose aboard the same airline. Plaintiff's instruction omitted any requirement of causation and in any event, there was no evidence at trial to justify any such instruction. The instruction was properly rejected.

DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Sims, J., concurred.